VON BREMEN et al. v. MacMONNIES et al.

(Supreme Court, Appellate Division, First Department. May 13, 1910.)

1. PARTNERSHIP (§ 229*)—SALE—RIGHTS OF PARTIES.

Defendants, who were two partners of a firm of three engaged in importing fancy groceries, shortly before the time for the termination of the partnership sold one of plaintiffs, the third partner, all their interest in the firm for a sum $1,500 in excess of the book value of such interest; no specific value being placed on the good will. They had previously offered plaintiff a larger sum, if he would sell his interest and agree not to engage in a competing business for two years, but he refused. Plaintiffs succeeded to the business, and defendants immediately formed a partnership and set up a similar business; it being understood by the plaintiff who purchased their interest that they would do so. *Held*, that the sale was not voluntary, and that defendants should be enjoined from the use of the cable address of the old firm, its list of customers and of labels, trade-marks, and packages similar to those owned or controlled by the old firm, from soliciting the agency for the sale of articles of which the old firm had the exclusive agency, and from soliciting orders for goods packed under special labels, trade-marks, and brands devised by the old firm for special customers, and that they should account for damages sustained by plaintiffs and profits realized by defendants from doing the acts prohibited, but that they should not be enjoined from soliciting the cus- · tomers of the old firm or from soliciting former agents of the old firm to enter their employ.

[Ed. Note.—For other cases, see Partnership, Dec. Dig. § 229.*]

2. CONTRACTS (§ 117*)—VALIDITY—PUBLIC POLICY.

A contract not to engage in a business, not limited as to time and place, is void as against public policy.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 554–569; Dec. Dig. § 117.*]

Ingraham, P. J., dissenting in part.

Appeal from Special Term, New York County.

Action by Henry ·Von Bremen and others against Frank MacMonnies and others. From a judgment for plaintiffs, both parties appeal. Modified and affirmed.

See, also, 132 App. Div. 912, 117 N. Y. Supp. 157.

On the 10th of May, 1904, the plaintiff Von Bremen, and the defendants, MacMonnies and Von Elm, entered into an agreement of copartnership, which by its terms was to continue until April 30, 1909. On the 10th day of February, 1909, the defendants sold to said plaintiff all their interest in the assets, good will, trade-marks, and other property of the firm, for $44,000, which was $1,500 more than the book value of said interest, but did not include any specific valuation of the good will. The said plaintiff assumed the liabilities of the firm. The plaintiffs have succeeded to the business thus purchased. The defendants immediately formed a copartnership and set up a

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

similar business, which was the importation of fancy groceries. The selling end of the business was conducted: (a) By sending letters, circulars, and price lists to the principal dealers in such articles in the large cities throughout the United States, and for this purpose the firm had compiled a list of 2,200 such dealers; (b) by selling through merchandise brokers in the different cities; (c) by the personal solicitation of a traveling salesman, one Houselle. The firm employed a representative in Europe, one Bigeon, through whom many of the articles dealt in were purchased.

This action is brought to enjoin certain acts of the defendants, which it is claimed tend to injure or destroy the good will of the old business, viz.: (a) Soliciting the customers of the old firm; (b) using similar labels, brands, trade-marks, tins, and packages to those used by the old firm; (c) interfering with the so-called "base of supplies" of the old firm; (d) soliciting the services of brokers of the old firm; (e) continuing the services of the salesman, Houselle, who, upon the sale to the plaintiff Von Bremen, resigned his employment with the old firm and was employed by the defendants; (f) continuing the services of Bigeon through whom the defendants have been purchasing supplies in Europe; (g) continuing the use of the list of 2,200 names of dealers which the defendant MacMonnies, procured to be copied, and which the defendants used for a time but have since returned to the plaintiffs; (h) continuing the use of the cable address "MacMonnies," used by the old firm. The trial court enjoined the use of the cable address, of the said list of 2,200 names, and of labels, brands, trade-marks, bottles, tins, and other packages, the same as, or similar to, those exclusively owned or controlled by the old firm, and directed an accounting of the damages sustained by the plaintiffs and of the profits realized by the defendants from such use.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, MILLER, and DOWLING, JJ.

Gustave Lange, Jr., for plaintiffs.
George W. Titcomb, for defendants.

MILLER, J. The important question in this case is whether the defendants may lawfully solicit the customers of the old firm. As bearing upon that question, certain facts need to be stated, the right to consider which depends on the view taken of the effect of the sale by the defendants to the plaintiff Von Bremen. It is undisputed, and the court found, that the plaintiff Von Bremen understood that the defendants were to engage in a competing business. They had previously offered him $56,500 for his interest if he would agree not to engage in a competing business for two years, and he had declined the offer. Prior to the sale, he had arranged with the plaintiff Asche, a discharged employé of the firm, to form a copartnership to engage in such business, and, in anticipation of that, Asche went to Europe, and, at the time of the sale, was making arrangements with packers for supplies. On the day after the sale, the plaintiff Von Bremen cabled the foreign representative, Bigeon, and followed the cablegram with a letter, virtually terminating the latter's employment, and directing him to deliver to the plaintiff Asche all labels, tins, orders, contracts, claims, and trade-marks. The said Von Bremen testified that they, meaning himself and the said Asche, took it for granted that Bigeon would not continue in their employment, and that they were afraid of him.

It plainly appears that the proposition to buy or sell was submitted by the defendants to the plaintiff Von Bremen in view of the fact that the copartnership was about to terminate, and the said plaintiff admitted that that was done to avoid a liquidation. There is no evi-

dence to show that the defendants have in any way held themselves out as the successors of the old firm, or that they have attempted in any way to deceive or mislead the public or the customers of the old firm. Said business, unlike a retail business, could only be conducted by personal solicitation of its customers in the manner hereinbefore stated, or in some similar manner. Its possible customers were limited in number, and, while the old firm did not sell to all of the persons, firms, or corporations dealing in the articles handled by it, it is quite apparent that, if the old customers were excluded from the number whom the defendants could convass, their business was doomed to failure. It must have been understood therefore, that, if the defendants were at liberty to engage in a competing business, they could use every means within the limits of fair competition to make it a success; and I think that all of the circumstances, including the nature of the business, the preliminary arrangements made by the plaintiff Von Bremen, his immediate cablegram and letter to the foreign representative, and his refusal to sell for a much larger price on condition that he agree not to engage in a competing business for two years, show that that was his understanding.

So far as the research of counsel, supplemented by our own, discloses, the important and interesting question involved in this case has never even indirectly been passed upon by the Court of Appeals of this state. The plaintiff relies upon Trego v. Hunt, L. R. (App. Cas. 1896) 7, decided by the House of Lords, which this court in this department followed in Goetz v. Ries, 123 N. Y. Supp. 433, affirmed 127 App. Div. 940, 111 N. Y. Supp. 1120, thereby overruling earlier decisions. Close v. Flesher, 8 Misc. Rep. 299, 28 N. Y. Supp. 737; Marcus, Ward & Co. v. Ward, 15 N. Y. Supp. 913, cited in U. S. Cordage Co. v. Wall's Sons Rope Co., 90 Hun, 429–434, 35 N. Y. Supp. 978. If this were a sale of his interest by a partner, voluntarily retiring from a copartnership, not then terminated or about to terminate by the expiration of the term fixed by the articles of copartnership, I should consider the Goetz Case as controlling upon us; but, because of that distinguishing feature, I think the question presented by this appeal is still open in this court.

In Trego v. Hunt the term fixed by the articles of copartnership was about to expire; but the defendant had agreed upon the formation of the copartnership that, upon its termination, its good will should belong to the other partner. The case, therefore, was in principle like the case of a voluntary sale by a partner, voluntarily retiring, and it was so considered by the court. The specific thing sought to be enjoined was the copying of the firm's list of customers to enable the defendant, upon the expiration of the copartnership, to canvass them. It is to be noted that the learned trial court in this case enjoined the use of the old firm's list of customers. While a somewhat narrow point was thus actually involved in that case, the court felt called upon to set at rest the uncertainty, due to earlier conflicting decisions, and therefore decided the broad question, and held that, upon the voluntary sale of the good will of a business, the vendor might set up a competing business, but could not solicit the customers of the old business. That case is undoubtedly a controlling authority in England upon that prop-

osition, and of course is entitled to great weight here. The grounds of that decision were that one may not derogate from his grant, and that a vendor may not retake what he has sold—propositions which no one will question. The difficulty consists in determining precisely what was sold, which obviously depends on the understanding of the parties. If it was understood that the vendor should be at liberty to engage in a competing business and to solicit the old customers, it is surely not a fraud upon the contract for him to do so.

Of course, if good will means under all circumstances what it was held to mean in Trego v. Hunt, it was for the defendants expressly to reserve the right to solicit the old customers, though it is perhaps hard for them that that proposition had not been decided, but is still an open question in this state. I have been unable to find anywhere a precise definition of "good will" of general application. In People ex rel. Johnson v. Roberts, 159 N. Y. 70, 53 N. E. 685, 45 L. R. A. 126, Judge Vann, after an exhaustive review of the authorities, stated his conclusion to be that good will embraces "at least two elements, the advantage of continuing an established business in its old place and of continuing it under the old style or name." It is to be observed that the plaintiffs in this case have both those advantages without any attempt at interference on the part of the defendants. In the course of his judgment in Trego v. Hunt, Lord Herschell stated that he did not think that the obligations of the vendor of the good will of a business would necessarily be the same under all circumstances, citing Cook v. Collingridge, 27 Beav. 456, in which Lord Eldon held that, in determining the value of the good will of a copartnership, expiring by effluxion of time, what should be valued was "the chance of the customers adhering to the old firm, notwithstanding that the previous partners or any of them carried on a similar business elsewhere"; and I think necessarily implying that the previous partners might solicit the old customers, for that was done in Cruttwell v. Lye, 17 Ves. 335, wherein Lord Eldon, in denying an injunction, defined good will as being "nothing more than the probability that the old customers will resort to the old place." It may be that that definition is now too narrow in view of the development of the law on the subject during the 100 years since it was written; but the citation of Cook v. Collingridge by Lord Herschell, as bearing on the question of good will where the partnership has terminated by effluxion of time, indicated that he was of the opinion that, under such circumstances, good will was not the same as in the case of a continuing business, and he further said:

"In cases of this description, where a partnership has been dissolved by effluxion of time or death, the good will is regarded as a part of the assets, and subject therefore to realizing on winding up the partnership; but it would obviously be absurd that, because a partnership becomes thus dissolved, those who formerly constituted the firm, or the survivors thereof, where the dissolution has been due to death, should thereafter be restrained from carrying on what trade they pleased."

I think that it would be equally absurd to hold, in the absence of an express covenant, that they should be restrained from carrying on what trade they pleased, in whatever manner they pleased, within the limits of fair competition.

It seems to me that no hard and fast rule, applicable under all circumstances, can be applied to the sale of so intangible and indefinable a thing as good will, and that the nature of the thing sold depends on the nature of the business and the circumstances under which it was sold.

Cases may be supposed in which, from the nature of the business, a sale of the good will alone would import an obligation on the part of the vendor not even to deal with the old customers, e. g., the case put by the learned counsel for the defendants of the sale of a milk route, and authority is not wanting for the proposition that the good will sold depends upon the circumstances under which the sale is made. Sir George Jessel was of the opinion that the vendor of a business was precluded not only from soliciting the old customers, but from accepting their custom (Ginesi v. Cooper, 14 Ch. D. 596); but yet he refused to enjoin one whose business had been sold by a trustee in bankruptcy from setting up a fresh business and soliciting his old customers, and he was affirmed on appeal, the court saying that it was immaterial whether the bankrupt joined in the conveyance. Walker v. Mottram, 19 Ch. D. 355. The Massachusetts courts hold that one who voluntarily sells the good will of a business cannot trade with his old customers even if they come to him unsolicited, and yet it was held in Hutchinson v. Nay, 187 Mass. 262, 72 N. E. 974, 68 L. R. A. 186, 105 Am. St. Rep. 390, that the surviving partner, who carried on the business at the old stand with the old customers for a year and 11 months and had then sold the good will of his business for $5,000, was not bound to account to the representatives of the deceased partner even for a nominal sum, on the ground that the good will sold was his good will and not that of the old firm, for the reason that, if the representatives of the deceased partner had forced him as survivor to sell the good will, as they doubtless could have done, he would have been at liberty to continue in business.

A contract not to engage in a business, if unlimited in respect of time or place, is void as against public policy, and it seems to me that the courts ought not to imply from the sale of so indefinable a thing as good will a contract to restrict one's right to make a success of his business without at least inquiring into the circumstances of the sale, and that it is, therefore, competent in this case to consider the surrounding circumstances for the purpose of determining what the parties understood was sold.

Hutchinson v. Nay and Walker v. Mottram, supra, indicate the distinction between a voluntary sale of a going business and its good will and such a sale where for any reason liquidation becomes necessary. That distinction was recognized in Trego v. Hunt. Now, in this case, the sale was not voluntary. While it anticipated by a few weeks the actual termination of the copartnership, it was made as the alternative of a liquidation. A sale was necessary either by the partners themselves or by a receiver, appointed on a dissolution. The partners had a choice of method only. They adopted the method of submitting a give or take proposition by one to the other as a substitute for an actual liquidation. The method selected was their voluntary act, but the sale itself was not; and it seems to me that the case is no different from

the fact that, in place of waiting until the partnership had actually terminated, they anticipated that event by a few weeks. It may be a question of fact upon what basis they actually dealt, although I think that the evidence points to but one conclusion. The trial court made no finding on the precise point, but did make a finding as to what the good will consisted of at the time of the sale, which is somewhat embarrassing. By the forty-seventh finding of fact, the court broadly defined what that good will consisted of, practically as claimed by the plaintiffs, viz., as being the trade and custom of the customers of the firm and the probability of its continuing, if not otherwise solicited; the continuance of control of brands of merchandise dealt in; the maintenance of its base of supplies, and the continuance of its employés, brokers, and salesman, all of which the court found that the defendants "have diverted, are actively diverting and are threatening to divert." That definition must have been made with reference to the good will of the copartnership, considered as continuing, not as about to terminate by the expiration of the term fixed by the articles of the copartnership. But even so considered, the definition is too broad. The court did not find, and could not have intended to find, that that was what the defendants sold to the plaintiff Von Bremen, because if custom, as distinguished from the probability that the old customers would continue to deal at the old place, was sold, the judgment should have been for the plaintiffs for practically all the relief asked.

If Trego v. Hunt be followed by the Court of Appeals, it seems to me that this judgment can only be sustained upon the distinction which I have attempted to point out; and the case ought to go to the Court of Appeals on a record which will present that distinction. For the purpose of sustaining the judgment, it may be assumed that the court found, what the undisputed evidence shows, i. e., that the contract of purchase and sale was entered into because, and in anticipation of, the approaching termination of the copartnership, and in lieu of an actual liquidation; that the defendants intended to sell, and the plaintiff Von Brémen understood that he was buying, precisely what a receiver, appointed on a dissolution of the firm, could sell.

The good will thus acquired by the plaintiff Von Bremen was of value. He thereby acquired the advantage of continuing an established business at the old stand either under the old name or as the successor of the old firm. The retiring partners took with them their personality, knowledge, and skill which they were at liberty to use in any business in which they might see fit to engage, keeping of course within the limits of fair competition and not infringing upon the particular thing sold. This view disposes of most of the questions presented. The brokers employed by the old firm were not under contract to sell exclusively for them. They were free agents, at liberty to deal with whomsoever they pleased, and the right of the defendants to sell through them must rest upon the same basis as their right to solicit the customers of the old firm. I do not think that the defendants could entice the employés of the old firm away. The court found that the salesman, Houselle, voluntarily and without solicitation from the defendants, resigned his position with the old firm and sought employment with the defendants. It is not claimed that he was under contract

for a definite term. The cablegram and letter of the plaintiff Von Bremen to the foreign representative, Bigeon, were plainly intended to terminate the relations with the latter, and the plaintiffs are therefore not in a position to complain of his employment by the defendants, even if they would otherwise have been in a position to do so.

I think, however, that the findings of the trial court require that the injunction be extended in two respects. The trial court found that the old firm was the exclusive agent in the United States for certain goods, packed under given brands, and that the defendants have solicited the agencies for such goods and have obtained and are selling certain of them. It was also found that the old firm had devised at their own expense special labels, trade-marks, and brands for specific customers. While the labels and trade-marks belonged to the customers, in order to fill orders expeditiously, the firm had to keep on hand a quantity of packages, tins, etc., thus specially labeled and marked, and at the time of the sale had on hand $11,000 worth of such materials. The court found that the defendants, with intention to divert the trade of former customers, have solicited and obtained and are filling orders for goods, packed under such special labels and brands, and that, to get such orders, they are even underbidding the plaintiffs. I think that the right to interfere with exclusive agencies for the sale of goods and to use special brands, devised by the old firm at their own expense, as a means of holding customers, stands on a different basis from the right to solicit the old customers. While it does not appear that such exclusive agencies were to continue for a definite term, they were a part of the business sold. If such agencies should be terminated without the interference of the defendants, they would doubtless be at liberty to accept similar agencies; but, by soliciting them before such termination, the defendants are directly trying to regain what they have sold. If the customers, owning the special labels and trade-marks, come to the defendants unsolicited, the defendants would doubtless, within the authority of Trego v. Hunt, have the right to label the goods sold in whatever lawful manner the customers might prescribe; but they should not be permitted to entice customers away from the old firm by the means established by the old firm at considerable expense to hold customers, thereby in effect destroying the tangible property and one of the incidents of the good will sold.

I think that the judgment should be modified so as to enjoin the defendants from soliciting the agency for the sale of articles of which the old firm had the exclusive agency and from soliciting orders for goods packed under special labels, trade-marks, and brands, devised by the old firm for special customers, and that the accounting should be extended to any damages sustained by the plaintiffs and to any profits realized by the defendants from such acts, and that, as thus modified, the judgment should be affirmed, without costs.

McLAUGHLIN and DOWLING, JJ., concur. LAUGHLIN, J., concurs in result.

INGRAHAM, P. J. I concur with Mr. Justice MILLER, except in one respect. I think the injunction should also be extended so as to re-

strain the defendants from soliciting any of the customers of the old firm, and also from soliciting the agents or representatives of the old firm to enter into the employ of the defendants. The question as to what is included in the sale of the good will of a business and the obligation assumed by the vendor is so thoroughly discussed in Trego v. Hunt, 1896 Ap. C. 7, that it is unnecessary for me to say more than that I think the principle established in that case should be adopted in this state. As was said by Lord Herschell, in his opinion in the House of Lords:

"It is the connection thus formed, together with the circumstances, whether of habit or otherwise, which tend to make it permanent, that constitutes the good will of a business. It is this which constitutes the difference between a business just started, which has no good will attached to it, and one which has acquired a good will. The former trader has to seek out his customers from among the community as best he can. The latter has a custom ready made. He knows what members of the community are purchasers of the articles in which he deals, and are not attached by custom to any other establishment."

Then, in discussing the obligation assumed by the vendor of the sale of the good will of a business, he said that for the vendor to invite the former customers of the firm, using the knowledge which he has acquired of what persons were such customers, by an appeal to them, to seek to weaken their habit of dealing where they have dealt before, or whatever else binds them to the old business and to secure their custom, is a direct and intentional dealing with the good will and an endeavor to destroy it. "But when he specifically and directly appeals to those who were customers of the previous firm he seeks to take advantage of the connection previously formed by his old firm, and of the knowledge of that connection which he has previously acquired, to take that which constitutes the good will away from the persons to whom it has been sold and to restore it to himself." And Lord MacNaghten says in this connection that:

"He [vendor] may set up where he will. He may push his wares as much as he pleases. He may thus interfere with the custom of his neighbor as a stranger and an outsider might do; but he must not, I think, avail himself of his special knowledge of the old customers to regain, without consideration, that which he has parted with for value. He must not make his approaches from the advantage ground of his former position, moving under cover of a connection which is no longer his. He may not sell the custom and steal away the customers in that fashion."

This court has followed that case in affirming an order made by Mr. Justice Bischoff in Goetz v. Ries, 127 App. Div. 940, 111 N. Y. Supp. 1120, and it had been followed in several other states, notably in Massachusetts and in the federal courts, and illustrates the gradual developments of the law by which equity steps in and prevents what, from the relation of the parties, and the obligations which have been assumed, would be unfair and dishonest competition in business.